UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT LEE WHITE,

               Plaintiff,                        Civil Action No. 2:12-14997

        v.                              District Judge Nancy G. Edmunds
                                             Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]**

In 2007, Plaintiff Robert White sustained an injury to his cervical spine that required a fusion of cervical vertebrae. Nonetheless, White recovered sufficiently to continue his work as a municipal refuse collector. In the summer of 2009, however, while riding on the back of a garbage truck, White was struck in the head with a tree branch and knocked off the truck. White maintains that the resulting cervical-spine injury, coupled with longstanding anger and anxiety issues, prevent him from working. As such, White applied for disability insurance benefits as provided by the Social Security Act. An administrative law judge, acting on behalf of Defendant Commissioner of Social Security, concluded that White was not disabled within the meaning of the Act. White filed this suit to challenge that determination.

Now before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 10, 12). For the reasons set forth below, this Court finds that the ALJ's assessment of White's credibility, although not as well-reasoned as it could be, is

supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for

Summary Judgment (Dkt. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt.

12) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of

Social Security be AFFIRMED.

## I. BACKGROUND

### A. Medical Evidence

In his application for disability benefits, White alleged that he became disabled on November

16, 2009. The administrative record, which contains medical evidence pertaining to both White's

psychological and physical impairments, begins not too much earlier. Although White's treatment

for these impairments overlapped, separate presentation aids understanding. So the Court first

summarizes White's mental-health treatment records and then turns to those records pertaining to

White's physical impairments.

#### 1. White's Mental-Health Treatment

In June 2009, White underwent an evaluation with a psychiatrist he had treated with before,

Dr. Kang Kwon. (Tr. 264-73.)[1] White described some of his past personal history: he grew up poor

with no father, saw a court-appointed psychiatrist for a year, dropped out of school around age 13,

hung out with gang members, first married around age 18, later married three more times, had been

charged with assault and attended anger-management treatment. (Tr. 264, 266, 268, 271.) White also

told Dr. Kwon about his present condition: he was in marriage counseling, and he was experiencing

a depressed mood, some problems with concentration, and panic attacks or obsessions. (Tr. 265-66.)

---

[1]White treated with Dr. Kwon, although perhaps not consistently, for a number of years. (*See* Tr. 282.) The administrative record, however, contains only Dr. Kwon's treatment notes beginning in June 2009.

White said that his supervisor at work belittled him and that he "worrie[d] about [his] job." (Tr. 271.) Dr. Kwon observed that White's mood was moderately depressed and his affect "constricted." (Tr. 270.) White was "paranoid[,] guarded." (Tr. 270.) Dr. Kwon diagnosed dysthymic disorder, anxiety disorder (not otherwise specified), impulse control disorder, and avoidant personality. (Tr. 273.) He assigned White a Global Assessment Functioning (GAF) score of 54 indicating moderate symptoms. (Tr. 273.)[2] Dr. Kwon prescribed Xanax 0.5 mg (a medication for anxiety and insomnia) and Prozac 20 mg (a medication for depression). (Tr. 272.)

White next saw Dr. Kwon in August 2009. (Tr. 262-63.) White reported mood swings and that his job was "rough." (Tr. 262.) He said he was sleeping well but racing thoughts made him feel tired. (*Id.*) White reported seeing a therapist and a marriage counselor. (*Id.*) Dr. Kwon maintained White's Xanax and Prozac prescriptions but added Seroquel (a medication that can treat schizophrenia, bipolar disorder, or major depressive disorder). (Tr. 263.)

In September 2009, White told Dr. Kwon that he had recently been jailed for several days. (Tr. 260.) Further, White's mother was sick. (*Id.*) White reported feeling stressed out and getting angry easily. (*Id.*) He said that he could not take Seroquel; Dr. Kwon maintained White's Prozac prescription, doubled the dosage of Xanax, and added Lamictal, 100 mg (a medication that treats seizures and mood disorders). (Tr. 261.)

In November 2009, White had a 15-minute medication review with Dr. Kwon. (Tr. 258-59.)

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). A score of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

White was emotional. (*See id.*) He reported being hurt on the job, financial problems, the death of his grandmother, the sickness of his mother, and rape of his daughter. (Tr. 258.) His wife had no patience with him. (Tr. 259.) White also was emotional over the fact that he was an athlete, only 34 years old, but "ha[d] to quit everything." (Tr. 259.) Dr. Kwon maintained White's Xanax, Lamictal, and Prozac prescriptions. (*Id.*)

White next saw Dr. Kwon for a medication review in January 2010. (Tr. 256-57.) White told the psychiatrist that he no longer had insurance but thought that he would soon have worker's compensation. (Tr. 256.) He explained that he had been arguing a lot with his wife due to their financial problems, and that his stepdaughter would team up with his wife in the arguments. (Tr. 256.) He also stated that his two sons were turning against him. (Tr. 258.) Dr. Kwon refilled White's Xanax and Prozac prescriptions. (Tr. 259.)

In February 2010, White reported that his wife was never home, that he felt angry, had sleep problems, and had no hobbies. (Tr. 254-55.) Dr. Kwon noted that White was "grumpy." (Tr. 255.) The psychiatrist refilled White's prescriptions for Xanax, Prozac, and Lamictal. (*Id.*)

The next month, White said things were a little better with his wife. (Tr. 252.) But White was still having some problems with sleep and racing thoughts. (*Id.*) Dr. Kwon refilled White's Xanax and Prozac prescriptions. (Tr. 253.)

At his April 2, 2010 medication review, White told Dr. Kwon, "I can't handle myself if I am disabled." (Tr. 250.) Dr. Kwon noted, "He threatens that if he doesn't get his way[] then he might lose his control. He [claims?] that he is a man enough and can't let people to defeat him." (*Id.*) Dr. Kwon refilled White's Xanax and Prozac prescriptions and added Saphris (a medication that can treat schizophrenia or bipolar disorder). (Tr. 251.)

4

Four weeks later, White told Dr. Kwon that he had not taken Saphris because it made him feel "weird." (Tr. 249.) White's worker's compensation litigation was still ongoing and things remained difficult with his wife. (Tr. 248.) White reported pacing at home. (*Id.*) He had, however, cleaned the house and spent time with his brother. (Tr. 248.)   Dr. Kwon refilled White's prescriptions for Xanax and Prozac. (Tr. 249.)

In late May 2010, White told Dr. Kwon that he had been staying at home and did not do much; the psychiatrist noted, "video games are too boring." (Tr. 246.) White did have a cookout for his mother on Mother's Day, however. (Tr. 247.) White was still having racing thoughts but was sleeping "ok." (*Id.*) Dr. Kwon gave refills for Xanax and Prozac. (Tr. 247.)

Because of insurance reasons, White last saw Dr. Kwon on June 24, 2010. (Tr. 244-45.) He told the psychiatrist that he had found a half brother on Facebook whom he had not seen since childhood. (Tr. 244-45.) He also told Dr. Kwon that things had improved some with his wife. (Tr. 244.) Dr. Kwon gave refills for Xanax and Prozac. (Tr. 245.)

In August 2010, Matthew Dickson, Ph.D., a licensed psychologist, evaluated White on behalf of the Michigan Disability Determination Service, a state agency that helps the Social Security Administration evaluate claimants. (Tr. 282-85.) White described his symptoms this way:

> My anxiety makes me dizzy and nauseous and numb and then I get very angry. The anxiety can start up from anything—bad news, authority, someone doing something wrong, a lot of people around me. I can start throwing things, breaking things, hitting people. I try to hit things instead of people. As a kid was when I hit people. That's why I try to stay away from groups. Dr. Kwon has me diagnosed with anxiety disorder, and I don't know what he has about the anger part.

(Tr. 282.) White explained to Dr. Dickson that he angered quickly, stayed out of groups because he did not like to be touched, did not have friends because he did not trust people; Dr. Dickson noted

5

that White was "not friendly" during the exam. (Tr. 283.) White described his self esteem as "pretty low." (Tr. 284.) Dr. Dickson found no significant evidence of hallucinations, delusions, obsessions, or thoughts controlled by others. (Tr. 284.) White was not "overtly anxious." (*Id.*) White could recall four numbers in the forward direction, three backward; Dr. Dickson noted, "[Mr. White] seemed capable of better performance on these tasks." (Tr. 284.) White did not complete the "serial sevens" test (a test of concentration requiring repeatedly subtracting seven starting from 100): "93, 86, 79, 72." (Tr. 284.) Dr. Dickson ultimately opined: "It is my impression that [Mr. White's] mental abilities to understand, attend to, remember, and carry out instructions are not impaired. [His] abilities to respond appropriately to coworkers and supervision and to adapt to change and stress in the workplace are moderately impaired." (Tr. 285.)

In September 2010, White sought treatment at Genesee County Community Mental Health. (*See* Tr. 292-03.) Marsha Marble, a licensed professional counselor and a licensed master social worker, performed an access screening. (Tr. 292-03.) White reported feeling depressed or sad most days. (Tr. 293.) Marble observed a sad and depressed mood, but White's affect was within normal limits, his thought content within the normal range, and his thought process was logical and coherent. (Tr. 294.) Marble provided a rule-out diagnosis of mood disorder, not otherwise specified and assigned a moderate-symptom GAF score of 58. (Tr. 297.) She further indicated that White "had a (provisional) diagnosis consistent with serious mental illness," but that White did not have "substantial impairment in daily living activity." (Tr. 298.)

### 2. White's Treatment for His Physical Impairments

It appears that in August 2007, at age 31, White was playing semi-pro flag football (in preparation for playing in an arena football league) and suffered a neck injury that required surgery.

6

(*See* Tr. 47.) Dr. Jawad Shah performed that operation, a C4-5, C5-6 diskectomy and fusion and a foraminotomy on the left at C4-5, C5-6. (*See* Tr. 47, 217.)

Almost two years later, in July 2009, White suffered two injuries. First, he fell off a garbage truck while working as a trash collector for the City of Flint. (Tr. 237.) White landed on his head which resulted in a headache. (*Id.*) Then, a week later, White received the injury noted at the outset: he was again on the back of his truck when a tree branch struck him in his head and knocked him off the truck. (*Id.*)

On the day of the tree-branch incident, White was evaluated at an "after hours" clinic; he was diagnosed with a concussion. (Tr. 237.) Apparently he was transferred to a hospital for a CT scan; it was negative. (*Id.*)

On October 29, 2009 White returned to Dr. Shah for the first time in almost two years. (Tr. 217.) Dr. Shah explained, "I last saw [Mr. White] in my office on 11/27/07 where he was experiencing tingling in his hands. On 9/29/09 [he] called my office stating that he was having severe neck pain. I ordered an x-ray of his Cervical spine that I will review along with his progress today." (Tr. 217.) White told Dr. Shah about his neck, back, and arm pain, dizziness, extremity weakness, loss of balance, loss of coordination, and speech problems. (Tr. 218.) In evaluating various muscle groups innervated by the spinal nerves extending from White's cervical vertebrae (e.g., biceps, triceps, and wrist flexors) Dr. Shah found that White's strength was "4+/5 bilaterally." (Tr. 217.) White diagnosed cervicalgia, i.e., neck pain, and explained:

> [Mr. White] had been doing wonderful. He tells me that he was capable of playing flag football, but is enjoying his life and doing wonderful, but while at work he was hit with a tree branch that ended up causing a concussion and leading to significant pain in his neck. Since that time, he feels tingling in his upper extremities, lower extremities, and feels something serious has happened.

7

(Tr. 218.) Dr. Shah ordered an MRI. (Tr. 218.) Based on a subsequent record, it appears that Dr. Shah prescribed Norco (a pain reliever) at this visit. (*See* Tr. 219.)

In January 2010, White underwent the MRI that Dr. Shah had ordered. (Tr. 221-23.) The radiologist's impression was "[n]o evidence of spinal stenosis," "[r]ight paramedian and lateral herniation of disc at C3-C4 level with narrowing the right C4 neural foramen," bilateral "mild" narrowing of the C5 neural foramen, an endplate osteophyte at C5 producing "mild ventral extradural impression," and a "linear abnormal signal in the ventral aspect of the spinal cord at C4-C5 . . . most like due to ischemia." (Tr. 223.)

White returned to Dr. Shah in February 2010. (Tr. 219-20, 229-30.) White continued to report neck, back, arm, and leg pain. (Tr. 219.) He also reported loss of balance and coordination. (Tr. 219.) Dr. Shah summarized his treatment plan as follows:

> He continues to have neck pain post accident. . . . His MRI shows no evidence of compression of his neural elements and his main pain is axial in nature.[3] I believe physical therapy may help him, but ultimately if he continues to have cervicalgia, one would have to raise the idea of doing a posterior stabilization procedure, which I very much would like to avoid.

(Tr. 219.) Dr. Shah recommended a month of physical therapy followed by a return visit. (*Id.*)

In May 2010, a nurse, "ja", evaluated White for purposes of physical therapy. (Tr. 231-35.) The nurse found that White had a "decreased range of motion" of his cervical spine and muscle

---

[3]Axial neck pain involves the vertebrae at C2, C3, and C4: "The C2-3 facet joints may be the source of occipital, or cervicogenic, headache. The C2-4 nerve roots are not associated with motor involvement. Axial neck pain may radiate to the shoulders and head." Bernard M. Karnath, MD, *Identifying the Musculoskeletal Causes of Neck Pain*, J. of Musculoskeletal Med. Vol. 26, No. 3 (2012), *available at* http://www.musculoskeletalnetwork.com/display/article/1145622/2052192 (last visited Nov. 10, 2013).

spasms. (Tr. 233.) She also thought that White had parathesia in both arms. (*Id.*) White exhibited no difficulty with walking or standing, however. (*Id.*)

Also in May 2010, Dr. W. J. Boike, a neurologist, performed an independent medical evaluation of White, apparently in connection with White's worker's compensation case. (Tr. 237-39.) White told Dr. Boike how his injuries occurred. (Tr. 237.) He then explained his current symptoms: that his head and neck would "go numb and tingly" and that, at various times, his arms, legs, or both would become weak. (Tr. 237.) White also told Dr. Boike that, on some days, he could not get out of bed by himself. (*Id.*) Dr. Boike noted that White had a "very peculiar demeanor." (Tr. 238.) White exhibited tremor and "diffuse giveaway" in his arms, but Dr. Boike thought that the tremor was "non-physiologic in nature." (Tr. 239.) "With persistence, normal strength [was] noted in all extremities both proximally and distally." (*Id.*) On sensory exam, White "report[ed] patchy pinprick loss over both hands." (*Id.*) Dr. Boike also noted, "Mr. White demonstrates a very peculiar and non-physiological gait, with very short steps. When I asked him to lengthen his gait, he then took steps approximately three feet in length, pausing on each foot." (*Id.*) Dr. Boike concluded,

> His neurological examination is remarkable only for non-physiological pinprick loss in hands, upper extremity giveaway weakness, a non-physiological tremor, and a peculiar affect and gait pattern. There is no objective clinical evidence of neurological impairment or disability. I do not believe Mr. White has a cervical radiculopathy or myelopathy. I do not believe the work episodes, as described, have resulted in any significant neurological or spinal impairment or disability.

(Tr. 239.)

On July 23, 2010, White returned to Dr. Shah for the final visit reflected in the administrative record. (Tr. 279-80.) White reported "a variety of symptoms." (Tr. 279.) He told Dr. Shah that he had neck pain, burning sensations in his arms, visual disturbances, headaches, memory problems,

and low-back and leg pain. (Tr. 279.) White further said that he had been falling and forgetting things. (*Id.*) Dr. Shah thought that the "intrinsic changes" in White's cervical spine could "certain[ly] lead to dysesthetic pain in his arms and even to some degree to lower extremity weakness." (*Id.*) Dr. Shah did not think, however, that White's cervical spine condition was related to his back pain, visual disturbances, or memory problems. (*Id.*) He concluded,

> To do my due diligence, I do think an MRI of the brain and lumbar spine would be important, but if there is no significant pathology there, I do not believe there is anything further that I can offer in his care. Overall, I have a fairly strong familiarity relationship with the patient and we certainly want to do everything I can to help him and therefore we could see him one more time to go over his MRI results, but overall if there is no significant pathology, I do not believe there is anything further I can offer.

(Tr. 279.)

### B. Testimony at the Hearing Before the ALJ

Following the Social Security Administration's initial denial of White's application for disability insurance benefits, White requested a hearing before an administrative law judge. (Tr. 14.) On July 19, 2011, White testified before Administrative Law Judge Joseph L. Brinkley about his mental impairments, his physical impairments, and the functional limitations stemming from both. (*See* Tr. 28-61.)

White told the ALJ that he suffered from anxiety on a daily basis. (Tr. 42.) When the ALJ asked White about his statement to Dr. Kwon about losing control if he did not get his way, White responded: "I have blackout spells. And when I get anxiety, a lot of times I'll wake up out of it and someone is bloody. That's why I stay away from people." (Tr. 38.) When asked about his racing thoughts, White explained: "At one time I was going to do harm to one of the psychiatrists. So they put me in the hospital for mental health, and then I attacked people in there. So they had to lock m[e]

10

in my room and give me a shot." (Tr. 38.) Regarding his concentration problems: "There's a lot of times I could be doing something and just end up pacing because I don't know what I'm doing until the kids ask me what are you doing? I try to remember what I started to do." (Tr. 42.) White thought that his anxiety and anger problems caused him to have headaches. (*Id.*) White stated that he had counseling at Genesee once every two weeks and saw a psychiatrist there every three months. (Tr. 50.) White was still taking Prozac and Xanax. (Tr. 37.)

White also testified about his cervical-spine condition. When the ALJ asked how his pain rated on a zero-to-ten scale, where ten equated to "excruciating pain such that you can't tolerate it," White stated that his pain was a "[t]en . . . [e]very day, 24/7." (Tr. 51.) White also explained, "It's like I have no motor skills. It's like I could just be walking and just fall. I have so many scars on my back right now from falling all the time, its unbelievable." (Tr. 39.) White said he would not venture into his basement for fear of falling; one time, White explained, "I was laying there for hours before I could get someone to come help me." (Tr. 40.) Perhaps related to experiencing falls without warning, White stated that he "tr[ied] not to drive": "since the injury, I've had multiple tickets and crashes." (Tr. 34.)

White also described his day-to-day activities and functioning. White said he could do some tasks around the home. In the yard, White said he would cut his grass with a riding mower. (Tr. 36.) Performing this task, however, took White "about eight hours" because the mowing was "bumpy," which hurt his neck and back. (Tr. 36.) Inside the home, White stated that he would "[v]acuum, [wash] dishes, dust maybe." (Tr. 37.) "Just minor little things to try and help the wife out if I can." (*Id.*) When asked if he performed these tasks continually throughout the day, White responded, "Normally, when I wake up, it's spaced out until [my wife] gets home from work. If it's finished,

11

it is. If it isn't, then she finishes it." (*Id.*) White also said that when his wife returned from shopping, "I'll grab milk or some bags or maybe a case of pop and try to carry that. On an average, I probably drop 2-3 things each time." (Tr. 41.) White also stated that he napped every day, "[o]ne to four hours." (Tr. 40, 50.) White testified that he could sit for "[m]aybe 30" minutes before back and neck pain and (although the testimony is a bit ambiguous) headaches prevented him from continuing. (Tr. 40.) When asked for how long he could walk, White explained, "about 20-30 minutes, maybe 40 if I can push it, try to hold onto the walls or something." (Tr. 41.)

Having heard White testify, the ALJ then asked a vocational expert present at White's hearing to consider a hypothetical individual with functional limitations that the ALJ believed approximated White's. In particular, the ALJ asked the expert to consider someone who could perform "light" work as defined by the social security regulations (lifting 20 pounds "frequently," 10 "occasionally," and standing or walking for two-thirds of the workday while sitting the remainder, *see* 20 C.F.R. § 404.1567), but could only "occasional[ly]" stoop, squat, and crawl, could not climb ladders, ropes, or scaffolds, and needed to avoid "concentrated exposure to dangerous hazards in the workplace which would include dangerous moving machinery and unprotected heights"; further, this individual had to avoid contact with others and was limited to one- and two-step tasks that were unskilled and simple in nature. (Tr. 56-57.) The vocational expert thought that there were jobs with demands consistent with these limitations: assembler, machine operator, and inspector. (Tr. 57.)

The ALJ then asked the vocational expert to consider a second hypothetical individual, this one apparently based on White's testimony. In particular, the ALJ asked the expert about job availability for someone with the limitations of the first hypothetical individual but with the

following, additional restrictions: sitting for only 30 minutes at a time, standing and walking in combination from 20-40 minutes at a time, needing to sit or stand at will, lifting no more than 20 pounds occasionally or less than seven pounds "frequently," and needing "the option to be off task taking naps for 1-4 hours per day." (Tr. 58.) The expert testified that there would be no work for a person with these limitations and identified one as dispositive: "The need to take naps for that amount of time during the workday would preclude any employment." (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

13

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Based on White's testimony and the administrative record, on July 25, 2011, ALJ Brinkley, applying the above five-step framework, concluded that White was not under a "disability" as that term is used with the Social Security Act. (*See* Tr. 14-22.) At step one, the ALJ found that White had not engaged in substantial gainful activity since the alleged disability onset date of November 16, 2009. (Tr. 16.) At step two, he found that White had the following severe impairments: mood disorder, anxiety disorder, personality disorder, degenerative disc disease, status post fusion, and neck pain. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 16-18.) Between steps three and four, the ALJ determined that White had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567 with the additional limitations of only occasionally stopping, squatting, crawling; never climbing ladders, ropes, or scaffolds; avoiding concentrated exposure to workplace hazards; having no more than superficial contact with the public; and engaging in simple, unskilled one- and two-step tasks. (Tr. 18; *see also* Tr. 19-21.) At step four, the ALJ found that White was unable to perform any past relevant work. (Tr. 21.) At step five, the ALJ—based on the vocational expert's hearing testimony—concluded that sufficient jobs existed in the national economy for someone of White's age, education, work experience, and residual functional capacity. (Tr. 21-22.) The ALJ

14

therefore concluded that White was not under a "disability" as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 22.)

White sought further administrative review, but, on September 13, 2012, the Social Security Administration's Appeals Council denied White's request. (Tr. 1.) ALJ Brinkley's decision thus became the final decision of Defendant Commissioner of Social Security. It is this decision that is now under review.

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation

15

marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

White's challenge to the Commissioner's disability determination consists of a single claim of error. White says that the vocational-expert testimony the ALJ relied upon to conclude that White could work is not substantial evidence supporting that finding. The reason, White says, is that the vocational expert testified that there were jobs available for someone who has more functional ability than he does. (*See* Pl.'s Mot. Summ. J. at 12.) White maintains that his functional limitations are "much closer" to the second hypothetical that the ALJ asked the vocational expert to consider—the individual that the expert said could not engage in full-time work. (*See id.*) The basis for this assertion, White says, is his hearing testimony. (Pl.'s Mot. at 6, 11-12.)

White relies on both his physical- and psychological-impairment testimony. Regarding the former, White points out that he told the ALJ that he could fall "at any time," that he lacked motor skills, that he dropped groceries, that he could sit for only 30 minutes and stand or walk for only 20

16

to 30 minutes, and that his medication caused dizziness and drowsiness and required daily napping. (Pl.'s Mot. at 10-11.) As for his mental and emotional impairments, White relies on his statements about blacking out, engaging in violent acts, and losing concentration and then "pacing." (*Id.*) Maintaining that both sets of allegations are "backed up by medical records," White claims that the ALJ committed reversible error in failing to credit his statements about the limiting effects of his impairments. (*Id.* at 11.)

Although the issue is not completely one-sided, the Court believes that White has not shown that the ALJ unreasonably decided to discredit his testimony insofar as his allegations went beyond those limitations set forth in the ALJ's residual functional capacity assessment and the corresponding hypothetical to the vocational expert. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying").

The Court first considers White's allegations about his mental and emotional impairments. Although the ALJ should have been more articulate, the ALJ rightly implied that the state-agency psychologist's evaluation, and the Genesee County therapist's evaluation, undermine White's allegations that his blackout spells, violent tendencies, and loss of concentration are disabling. In particular, the ALJ stated:

> At the initial evaluation, [Dr. Kwon] assigned a global assessment of functioning (GAF) of 54 (6F). Dr. Dickson also assigned a GAF of 54, and the Genesse County evaluation referenced a GAF of 58 and noted normal mental status (6F, 8F). These assessments do not

17

suggest any more restrictions than I have noted in the RFC.

(Tr. 20.) GAF scores are not particularly probative in the disability analysis, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006); still, each of the scores cited by the ALJ do indicate only moderate symptoms, *DSM-IV* at 34. Further, the ALJ rightly noted that Marble's mental status evaluation was, in significant respects, normal: the Genesee County therapist thought that White's affect was within normal limits, that his thought content was within the normal range, that his thought process was logical and coherent, and that White did not have "substantial impairment in daily living activity." (Tr. 294, 298.) And because the ALJ appears to have impliedly credited Dr. Dickson's evaluation, the Court adds that the psychologist opined, "It is my impression that [Mr. White's] mental abilities to understand, attend to, remember, and carry out instructions are not impaired. [His] abilities to respond appropriately to coworkers and supervision and to adapt to change and stress in the workplace are moderately impaired." (Tr. 285.)

Further—although the ALJ did not provide this rationale—the Court notes that it is not clear that White's testimony about black out spells and violent episodes pertained to the disability period. At his June 2009 evaluation with Dr. Kwon, the psychiatrist provided that White's violation ideation was only "slightly problematic." (Tr. 266.) And in a section of the form titled "*Past* Suicidal/Violent Ideation or Behavior," Dr. Kwon wrote, "He was violent in the *past*. He *had* black out spells." (Tr. 266-67 (emphases added).) In the treatment that followed, Dr. Kwon did note anger on multiple occasions. (Tr. 250 ("He threatens that if he doesn't get his way[] then he might lose his control."); Tr. 254 ("He is angry nasty").) Still, Dr. Kwon did not note anything similar to White's testimony that "when I get anxiety, a lot of times I'll wake up out of it and someone is bloody. That's why I

18

stay away from people." (Tr. 38.)

Moreover, all of the evidence, both supporting and undermining White's allegations, must be contrasted against the rather-restrictive psychological limitations the ALJ included in the hypothetical to the vocational expert: no more than superficial contact with the public and only simple, unskilled one- and two-step tasks. (Tr. 18.)

In all, the Court believes that the record permitted the ALJ to discount White's testimony about blackout spells, violent tendencies, and loss of concentration to the extent that those allegations establish functional limitations beyond those provided to the vocational expert. *See Daniels*, 152 F. App'x at 488; *Jones*, 336 F.3d at 476.

Turning to White's allegations of physical limitations—dropping items, limited sitting and standing, unpredictable falling, leg weakness, and medication side effects—the ALJ gave sufficient reasons for not fully crediting these claims. Regarding White's claims of drowsiness from medication and needing to nap one to four hours per day, the ALJ concluded that "[t]he treatment notes do not substantiate side effects from medication." (Tr. 20.) The ALJ's statement is too broad: White reported to Dr. Kwon that both Saphris and Seroquel had resulted in side effects. (Tr. 249, 260.) But it is true that White did not report to the psychiatrist that Xanax or Prozac (which were the only medications White was taking at the time of his testimony (Tr. 37)) ever made him drowsy or tired to the point of needing to nap one to four hours every day. (*See* Tr. 244-71.)

The ALJ also reasonably concluded that the medical records "do not substantiate . . . frequent falling." (Tr. 20.) White testified, "It's like I have no motor skills. It's like I could just be walking and just fall. I have so many scars on my back right now from falling all the time, its unbelievable." (Tr. 39.) It is true that White reported to Dr. Shah, on more than one occasion, that he had "[l]oss

19

of balance" and "[l]oss of coordination." (Tr. 218, 219.) Still, it was not until July 2010—about a

year after the tree-branch incident—that Dr. Shah's notes reflect a complaint of falling. (Tr. 279.)

And even then, it is not clear that Dr. Shah's medical findings substantiated White's symptoms:

> [Mr. White] comes in with a variety of symptoms. He tells me that he
> has pain in his neck, burning sensations into his arms, visual
> disturbances, headaches, memory problems, pain in his low back and
> pain in his legs. He is falling. He is forgetting things at times and it
> is very difficult to pinpoint specifically what his main issues are. I do
> believe that the cervical spine though requires no further surgery and
> the intrinsic changes we are seeing can certain[ly] lead to dysesthetic
> pain in his arms and even to *some degree* to lower extremity
> weakness. I do not think it will lead to low back pain, nor do I think
> it is related to his visual disturbances or memory problems.

(Tr. 279 (emphasis added).) The ALJ also correctly noted that a brain CT scan immediately after the

tree-branch injury was negative; in October 2009, White exhibited full strength in his lower

extremities; in February 2010, Dr. Shah said that White's cervical spine MRI did not show evidence

of compression; and, at his May 2010 physical-therapy evaluation, White had no difficulty walking

or standing and no neurological abnormalities. (*Compare* Tr. 19-20, *with* Tr. 217, 219, 233, 237.)

As for White's testimony that he could sit for only 30 minutes, the cause, said White, was

"neck and back" pain "[a]nd then I get headaches." (Tr. 40.) Although it is unclear whether the ALJ

had this specific testimony in mind, he nonetheless reasoned, "the claimant takes no pain medication

and has not sought frequent or emergency treatment." (Tr. 20.) This statement is not quite right.

White was prescribed Norco by Dr. Shah and testified at the hearing that he was not taking pain

medication because of insurance problems. (Tr. 37, 219, 279.) Still, White did not identify any over-

the-counter pain medications he was taking, and it is also true that the record does not indicate that

White sought emergency medical care; both of these facts are in tension with White's testimony that

he has ten-out-of-ten pain "[e]very day, 24/7," (Tr. 51.)

20

In all, although there is undoubtedly evidence supporting White's testimony of frequent falls, impaired motor skills, debilitating pain, and medication side effects, the Court cannot say that the record establishes that the ALJ reversibly erred in failing to fully credit White's allegations on these topics.

For the reasons set forth above, this Court finds that, while close, the ALJ's assessment of White's credibility is supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 12) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the

response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  November 21, 2013


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 21, 2013.


s/Jane Johnson
Deputy Clerk